Plaintiff was seriously injured on June 26, 1941, while performing the duties of his employment with defendant, Frost Lumber Industries, Incorporated, and sues for compensation at the rate of $8.19 per week for four hundred (400) weeks, less payments theretofore made, alleging that his injuries are permanent and disability therefrom total.
Defendant's answer and its position here limit the issues to one, to-wit: Was plaintiff totally disabled to perform manual labor when the suit was filed and at time of trial? The lower court resolved this factual question against defendant and rendered judgment for plaintiff for compensation at the rate of $7.80 per week during disability not exceeding four hundred (400) weeks. Defendant appealed. Transcript was filed in this court on June 22nd.
On October 2nd, appellant filed motion here praying that the case be remanded in order to enable it to introduce testimony to support the allegations of the motion that *Page 286 
plaintiff as early as June 1st had fully recovered from his injuries and had procured gainful employment. The motion is supported by affidavits of three different persons to the effect that plaintiff was employed by the Shreveport Charity Hospital on June 1st to perform miscellaneous services there and did so from that date until June 26th and again from July 16th until August 12th at a salary of $38.50 per month, plus three meals daily.
The motion is not well founded. There is no provision in the Employers' Liability Act nor in the general laws of this state which authorizes the remanding of a case of this character with facts as they appear therein for the purposes for which prayed.
Section 20 of the Employers' Liability Act, Act No. 20 of 1914, as amended by Act No. 85 of 1926, provides that a judgment for compensation may be judicially modified at any time after lapse of six months subsequent to rendition thereof on the ground that the incapacity of the employee has subsequently diminished or increased. Judgment in this case was rendered April 25, 1942. The six month period mentioned in the statute will expire on October 25, 1942. The right to ask for modification of the compensation award will thereafter arise.
The identical question tendered by the motion arose in Daniels v. Shreveport Producing Refining Corporation, 151 La. 800, 92 So. 341, 342, which was prior to the 1926 amendment reducing the period before modification could be asked, from twelve months to six months. It was held in that case as reflected from the syllabus, that:
"Under Act No. 38 of 1918, § 20, providing for modification of a compensation judgment or for review at any time after one year, a compensation case will not be remanded for the taking of testimony as to an alleged increase in plaintiff's wage earning capacity since the trial, where the year has almost expired, as this would deprive judgments of all stability or value."
Cases cited by mover are not pertinent.
The motion to remand is denied.
The trial judge gave cogent written reasons for the judgment rendered by him. In a painstaking manner he fully analyzed the extremely conflicting medical testimony (not an uncommon condition in compensation cases), and, in our opinion, has given the degree of weight and credit due the testimony of each physician. Our own conclusion thereon has been reached by independent study of the entire record. The trial judge has so cogently and logically discussed and analyzed the testimony in the case, additional discussion and analysis on our part would appear superfluous and would serve no useful purpose. We have decided to adopt said reasons for judgment and make them our own, omitting therefrom redundant portions, to-wit:
"Plaintiff sues for compensation for injuries received while working for defendant on June 26, 1941, while loading creosoted piling on to a railroad flat car. He alleges that while standing on a flat car, three poles were being lowered into position and which struck him in the back causing him to jump or fall from the flat car, falling upon his back upon a steel rail of the railroad; said fall seriously and permanently impaired the muscles, nerves and ligaments of his back and spinal column, as well as the sacro-iliac area; also the displacement and fracture of the fourth and fifth lumbar vertebrae, as well as the 7th, 8th and 9th thoracic vertebrae. * * *
"The evidence shows that plaintiff was injured on his first day of employment, some time in the afternoon, at which time he was placed in the shade by fellow employees, where he remained for a time and then attempted to work again for some thirty minutes before the day ended; that he returned to work the next morning, and being unable to perform his duties, returned home and then called his employer and asked for medical assistance, and was sent to the Tri-State Hospital for examination and treatment. Upon arrival at the hospital, Dr. Simpson examined him (plaintiff) and from that examination concluded that he had a sacro-iliac strain, as there was nothing to indicate a fracture; so he strapped plaintiff's back, sent him home and instructed him to return to the hospital if his back gave him any trouble. Plaintiff returned to the hospital on June 30th and was x-rayed by Dr. Jones, whose report was:
"`There is a transverse fracture of the right lumbar process of the right lumbar vertebrae and transverse fracture of the fourth and fifth spinus process. The positions are satisfactory.'
"Plaintiff continued going to the hospital for treatment and on September 19, 1941, was ordered to return on September 29th, at which time another x-ray was taken by Dr. Jones, and his report is as follows: *Page 287 
"`The sacro-iliac joints are undergoing closure. The fractured bodies reported in the spinus processes of the fourth and fifth are in good position and apparently healed.'
"Plaintiff was then discharged by the hospital as being able to return to work. However, defendant continued paying compensation to plaintiff, and on November 7, 1941, had plaintiff examined by Dr. Durham, who did not find any evidence of fracture, and was then of the opinion that plaintiff might be able to return to normal work in about a month. He said:
"`I simply told him that I thought if he would try to increase his activity in getting about, that his back would probably improve.'
"And again:
"`Q. What would you say about him doing work at this time? A. I believe that this man could do forms of light work. I do not say he could go into heavy lifting; since he has not been doing anything he would have to build himself up. He has made no effort to do that. He would have to gradually build up to the point where he could do heavy work by exercising more.'
"This testimony was given on February 10, 1942, and Dr. Durham had examined plaintiff on the day previous to the trial.
"When plaintiff was first x-rayed, Drs. Willis and Simpson of the Tri-State Hospital were of the opinion that the injury disclosed by the x-ray taken June 30th was of such a nature that it would heal within three months or by September 30th. Therefore, they testified that in their opinion he was able to return to work at the time of his discharge by them, Dr. Simpson stating:
"`In my opinion I thought that the boy could have returned to work much sooner than that, because September 29th was about the time these three months were up, and I figured that the boy should have been able to return to work about that time — the last of September or the first of October.'
"Dr. Willis disagreed with the finding of the radiologist in that he did not believe that plaintiff had received any fracture whatever.
"Dr. C.H. Mosely of Monroe, made x-rays of and for plaintiff on August 6, 1941, and testified in the case to the effect that there was a definite break of the 4th and 5th spinous processes; and a fracture of the 11th and 12th dorsal vertebrae and traumatic arthritis, and Drs. Alverson and Cannon testify that plaintiff has a board-like rigidity of his back, indicating a fracture, and that he is unable to work or do heavy lifting. Plaintiff testifies that he is unable to bend forward without pain, and this condition is approved by these doctors.
"Dr. Durham also made x-rays of plaintiff, `D-1, 2, 3 and 4,' (which do not appear very plain to me) and he testifies that they do not show any fractures. Dr. Jones, as stated, made x-rays, and Dr. Mosely made x-rays, and Dr. Durham states that he sees no evidence of fractures in these pictures, though Dr. Jones says his pictures showed fracture. Dr. Willis says it didn't; Dr. Mosely says it did, and says that his picture shows fractures, and Dr. Willis says the Jones pictures and the Mosely picture show the same things with reference to the fourth and fifth spinous process.
"Dr. Jones did not testify in this case; his first written report of his x-ray findings was filed in evidence by plaintiff and his second written report on picture taken September 29th was filed in evidence by defendant, from which we note:
"`The sacro-iliac joints are undergoing closure.'
"And to this is added that the fractured bodies reported in the spinous processes are in good position and appear to be healed. We direct our attention to the statement:
"`The sacro-iliac joints are undergoing closure.'
"There is no mention of any affection to the sacro-iliac joint in Dr. Jones' first x-ray report, and neither Dr. Willis or Dr. Simpson discuss the nature of that condition, but, if we are not wrong in our thinking, there must have been a separation or expanding of the sacro-iliac joint, otherwise there would have been no `closure' taking place, from which we infer that plaintiff received a sacro-iliac strain, which, from cases we have read, indicates a very painful sprain.
"Defendant agrees that the testimony is in hopeless conflict and the Court will have to rely upon incidents to guide it in making a decision. However, we do not think this necessary, but the incidents referred to appear to be more against defendant instead of plaintiff. For instance, plaintiff at the beginning of his injury received insurance benefits, which added to his compensation exceeded his weekly wage; therefore, it was to his interest to *Page 288 
recover compensation and not work, but the evidence shows that the insurance was paid only while plaintiff was under treatment of a doctor, and his insurance benefits had been stopped prior to the date defendant ceased compensation payments, and this suit was not filed until December 29th, more than a month later, at which time plaintiff was receiving neither insurance nor compensation.
"The fact that plaintiff had consulted a lawyer who directed him to go to Monroe and have Dr. Mosely make an x-ray (the reasons not being given), does not detract from the evidence in the case, and does not indicate that plaintiff intended `a frame up' on defendant and is now falsely testifying in the case; and, for my part, I approve the act. I think that it would save many law suits if injured employees were seen by physicians and x-rays made in the beginning, rather than to call a number many months afterwards and express opinions as to what might have been the condition, and the result thereof. At any rate, there is no indication that there was to be a framed up law suit. Defendant had the opportunity to x-ray plaintiff in the beginning, and plaintiff likewise had the right to have an x-ray made by a doctor of his own choice.
"There is an incident or two that are against the defendant. An x-ray of plaintiff was made June 30th, which Dr. Jones and Dr. Simpson say revealed fractures of the 4th and 5th spinous process, (nothing else), from which Drs. Simpson and Willis then considered that plaintiff would be well in three months (the usual time for that kind of an injury to heal), and, in accordance with that opinion, at the end of the three months, they discharged plaintiff as well. At the time of discharge another x-ray was made which showed the fracture had healed, and `the sacro-iliac joints are undergoing closure.' No mention of the sacro-iliac joint was contained in the first report, and no one testifies regarding it. Not only do the doctors discharge plaintiff as well on September 29th, but defendant sends plaintiff to another reputable doctor (Durham) some five weeks later, November 7th, who finds that at that time plaintiff `should' be able to return to work in about a month, but who, on February 10, 1942, would not say that plaintiff could do heavy lifting, but could do `forms of light work.' We are of the opinion that defendant's physicians looked only to the fractured spinous processes and when they healed, the doctors discharged him; but defendant apparently was not satisfied with this finding, but continued compensation another five weeks, and then sent plaintiff to another doctor, who then found plaintiff still unable to work. His x-rays failed to indicate any anatomical deficiencies, but he gave plaintiff another thirty days disability, which defendant paid, and then the suit followed. We do not know what Dr. Durham would have said about plaintiff if he had examined him at the end of the thirty days, as doctors, we think psychologically under-estimate the length of time that a person will be sick or disabled. We think that Dr. Durham's examination on the day previous to the trial and his findings were similar to those on November 7th, which, in their final analysis, are that plaintiff is disabled to do heavy work. Defendant conceded that they owed compensation following the November 7th examination and we think that under the evidence here, that he is still entitled to compensation.
"We do not feel that we are called upon to decide exactly the extent of plaintiff's injury, whether his disability resulting from fractured spinous processes has healed, whether it is arthritis in the joint, a sacro-iliac strain, or other fractures that might be contributing to the disability, — in view of the fact that the defendant's physicians do not agree among themselves. * * * *
"The plaintiff's case in chief, if believed, and we have no reason to even question its correctness in view of the conflicting evidence of the defendant, is a clear case in favor of the plaintiff. Therefore, for the reasons given, there should be judgment in favor of plaintiff for compensation at the rate of $7.80 per week during disability, not to exceed four hundred weeks, subject to the amount already paid, with interest etc.
"(We are not to be understood as holding that plaintiff is permanently disabled at this time.)
"Robert J. O'Neal."
We might add that plaintiff is an illiterate negro man, twenty-nine years old, who follows manual labor for a living. Being disabled to do such labor, he is without the ability to otherwise earn a livelihood.
For the reasons herein assigned, the judgment appealed from is affirmed with costs. *Page 289